

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00006-CV

BABCORP 200, LTD., Appellant

V.

CITY OF GRAND PRAIRIE, TEXAS, VICTORIA HESS, AND JEFF RICCI, Appellee

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-338185-22

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

Appellant, Babcorp 200, Ltd., challenges the trial court's judgment finding that a 16.9-acre parcel of land owned by Babcorp is zoned as "single family," rather than multi-family as Babcorp believed it to be at the time it acquired the property. On appeal, Babcorp argues that (1) the water well clause relied upon by Appellees, the City of Grand Prairie (City), Victoria Hess, and Jeff Ricci, is void; (2) the City's conduct since the creation of the water well clause "remove[s] or invalidate[s] the Water Well Clause (or show[s] that the Clause was satisfied)"; (3) the terms of City "Ordinance 3549 control over the City council's corresponding minutes" and those terms were satisfied; and (4) the water well clause was "amended or removed" by a later agreement with the City.[1]

Because we find that Babcorp presented legally sufficient evidence to support its affirmative defense of estoppel against the City, we reverse the judgment of the trial court and render judgment that the City is estopped from enforcing the reversionary clause in Ordinance 3549 against Babcorp.

## I. Background

In 1983, Great Western Development Co. applied to rezone a 152.752-acre tract within the City from single-family to planned-development zoning, which would contain single-family, retail, duplex, and multi-family parcels. In September 1983, the city council met to discuss the proposed rezoning and noted that there was a "discussion of a water well being constructed by

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We follow the precedent of the Second Court of Appeals in deciding the issues presented. *See* TEX. R. APP. P. 41.3.

the applicant" and that it "would distribute water to this subdivision and would tie into the existing water system that would enable it to exceed approximately 50% of its capacity for distribution to surrounding neighborhoods." The minutes went on to reflect that "the stipulation could be made that no buildings be built until the water system [was] looped," and Pat Moser of Gemcraft Homes, the applicant and developer (the developer) for the rezoning, "stated that the water problem [did] not have to be resolved before zoning [was] obtained."

Meeting minutes from a city council meeting on December 6, 1983, reflect that the water issue was, again, discussed in relation to rezoning the plat. It was discussed "that the water problem be resolved before approval of plats and a looped system required." The developer noted that "they [would] drill a water well in the area to provide water for the development; and that it would probably take approximately six (6) months to obtain necessary permits from the City and State and drill the well." Rezoning was recommended to be approved "with the stipulations outlined from Planning and Zoning: that the water well be completed within one year, and if it [was] not completed the zoning [would] revert back to Single Family."

In December 1983, the City enacted Ordinance 3549, which created a customized planned-development zoning district designated as PD-130 for the tract. Ordinance 3549 stated,

> Should the applicant fail to be *under construction* of the proposed well and related appurtances [sic] within one year of the date of this ordinance, this planned development zoning classification shall be null and void and reclassified as SF-1 as set forth in the Comprehensive Zoning Ordinance of the City of Grand Prairie.

(Emphasis added). Ordinance 3549 was "PASSED AND APPROVED BY THE CITY COUNCIL OF THE CITY OF GRAND PRAIRIE, TEXAS," and signed on December 6, 1983. A map of the proposed zoning indicates there is a 16.9-acre parcel designated as multi-family.

3

In October 1984, the city council discussed a proposed contract, drawn up by then city attorney, Clayton Hutchins, wherein the City would construct the water well and the developer would reimburse the cost. During the city council meeting, the developer asked that the contract with the City "substitute for the requirement of the zoning approval that construction of the well be completed by December 6, 1984," to which Hutchins "stated that the actual zoning ordinance states that construction begin by December 6, 1984." The motion to approve the contract at that session did not pass, and it was placed on the following week's agenda.

The motion to approve the agreement that the City construct the water well in exchange for $650,000.00 from the developer was made and carried by the city council at the October 30, 1984, executive session. Construction plans for the water well site were prepared in November 1984 and revised on December 4, 1984. Those plans were approved by the City. The City received payment as of December 11, 1984, and also accepted a deed of 0.6094 acres for the water well site. The water well was completed on March 9, 1985, and operated until plugged on August 20, 2020.

On at least four occasions between 1985 and 1992, the City either approved plats or adopted ordinances wherein the 16.9-acre parcel was shown to be zoned multi-family.

In May of 1992, Charter Energy, Inc., acquired 18.542 acres from Great Western. The 16.9-acre tract designated as multi-family was within the 18.542 acres. Prior to the acquisition, Charter's owner, Phillip Brooks, conducted a prepurchase investigation in which he determined that the property was zoned as multi-family.

4

In October 2002, Charter deeded the property to Babcorp. Brooks was the general partner that owned Babcorp at that time and remained in that position at the time of trial.

In September 2022, a plan for Babcorp's proposed apartment project on the 16.9-acre parcel was submitted to the City. The same day, Hess and Ricci, through counsel, submitted a letter to "protest" the proposed apartment project on the multi-family acreage, stating, "[T]he [p]roperty is zoned for . . . Single Family Residential." According to Hess and Ricci, the water well was not drilled in accordance with Ordinance 3549, and thus, the planned development zoning that allowed for multi-family structures was "null and void and reclassified as SF-1." Specifically, Hess and Ricci argued that "[n]o well or appurtenances were under construction as of December 1984, within one year of the date of the Ordinance" and therefore the zoning reverted to single-family.

In November 2022, the City filed its original petition and application for a temporary restraining order, temporary injunction, and permanent injunction in which the City requested the trial court make a determination regarding "pure questions of law," specifically, "What is the current zoning on the property that is the subject of [Babcorp's] application?" (Emphasis omitted). The City's original petition stated that the City's meeting minutes established one reversionary deadline, "that the water well be completed within one year" and that Ordinance 3549, enacted to create PD-130, signed by the mayor, varied in that it stated that the well must be "under construction" within one year. The original petition asked the trial court to answer several questions, specifically stating,

> Is the reversionary condition imposed by the City on PD-130 effective and valid, and if so, which deadline trigger applies? If the reversionary condition is valid,

5

can it be waived by subsequent amendments to other parts of PD-130? What is the current zoning classification applicable to [Babcorp's] proposed development? The Court must answer these questions before the City can consider whether the Concept Plan depicts a development that meets the applicable zoning requirements and restrictions.

Babcorp filed an answer stating that (1) "[t]he reversionary clause in Ordinance 3549 was satisfied," (2) in "the alternative, the reversionary clause in Ordinance 3549 [was] invalid," or (3) in "the alternative, [the] City should be estopped from asserting that the reversionary clause [in Ordinance 3549] was not satisfied and/or that the reversionary clause was valid." Babcorp later amended its answer, reasserting the arguments from the initial answer and stating that the water well clause in Ordinance 3549 "was invalid, unenforceable, and void," and even if it was not, it was fully satisfied. In the alternative, the amended answer stated that "the water well clause was revised, superseded, replaced and/or removed from PD-130" or that the City's actions "over 38 years" in essence confirmed the existence of the multi-family zoning in PD-130. Babcorp also filed its counterclaim seeking a declaration regarding its assertions related to the water well clause.

After a bench trial, the trial court ruled in favor of the City and intervenors, Hess and Ricci, holding that Babcorp's 16.9-acre parcel of land located in PD-130 reverted to single-family zoning when the well was not completed by December 1984. This appeal followed.

## II.     Validity of the Water Well Clause

### A.     Standard of Review

"In an appeal from a bench trial, the trial court's findings of fact have the same force and effect as jury findings." *Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557

6

S.W.3d 245, 257 (Tex. App.—Fort Worth 2018, no pet.) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). "We review a trial court's conclusions of law de novo as a question of law." *Id.* at 258 (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *A & W Indus., Inc. v. Day*, 977 S.W.2d 738, 741 (Tex. App.—Fort Worth 1998, no pet.)). "We independently evaluate conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts." *Id.* (citing *Walker v. Anderson*, 232 S.W.3d 899, 908 (Tex. App.—Dallas 2007, no pet.)). "We will uphold the trial court's conclusions of law if any legal theory supported by the evidence can sustain the judgment." *Id.* (citing *OAIC Com. Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied)). "We will reverse the judgment of the trial court only if the conclusions are erroneous as a matter of law." *Id.* (citing *OAIC Com. Assets*, 234 S.W.3d at 736).

### B. The Water Well Clause is Valid

Babcorp's first issue centers around the validity of the water well clause in Ordinance 3549. Babcorp argues that the water well clause is "void ab initio" because (1) "it is arbitrary or unreasonable, (2) it is an unconstitutional exaction, (3) it is an improper surrender of future legislative power, and (4) it purports to rezone the entire PD-130 tract without the required notice and hearing." Thus, Babcorp argues that the water well clause "should be severed from Ordinance 3549, so that PD-130 and its multi-family zoning for the Babcorp parcel remain intact."

### 1. Arbitrary or Unreasonable

"An ordinance is arbitrary or unreasonable if it bears no substantial relationship to the public health, safety, moral, or general welfare." *Super Wash, Inc. v. City of White Settlement* (*Super Wash I*), 131 S.W.3d 249, 256 (Tex. App.—Fort Worth 2004), *rev'd in part*, 198 S.W.3d 770 (Tex. 2006) (citing *City of Pharr v. Tippitt*, 616 S.W.2d 173, 176 (Tex. 1981); *City of Arlington v. City of Fort Worth*, 844 S.W.2d 875, 878 (Tex. App.—Fort Worth 1992, writ denied)). "The reasonableness of the ordinance is a question of law." *Id.* (citing *Tippitt*, 616 S.W.2d at 176; *City of San Antonio v. Arden Encino Partners, Ltd.*, 103 S.W.3d 627, 630 (Tex. App.—San Antonio 2003, no pet.)). "A zoning ordinance, duly adopted pursuant to Chapter 211 of the Texas Local Government Code, is presumed to be valid, and the burden is on the party seeking to prevent its enforcement to prove that the ordinance is arbitrary or unreasonable." *Id.* (citing *Bd. of Adjustment of San Antonio v. Wende*, 92 S.W.3d 424, 431 (Tex. 2002); *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 402 (Tex. 1964); TEX. LOC. GOV'T CODE ANN. §§ 211.001–.021 (Vernon 1999 & Supp. 2004)).

> Additionally, a municipal ordinance may be void as to some of its provisions and valid as to others. Where the ordinance is severable, so that invalid provisions may be eliminated leaving a valid ordinance, the invalidity of a part will not invalidate the whole. While courts may, at times, sever invalid portions of ordinances and leave in force the valid portions, they may not add to or redraft the ordinance. Furthermore, if eliminating the invalid provisions would thwart the intent of the governing body, then the entire ordinance is void.

*Id.* (footnotes omitted) (citations omitted).

Babcorp does not dispute that "providing for public water supply is consistent with 'the public health, safety, moral, or general welfare.'" Instead, it argues that because zoning by itself

8

does not authorize a developer to build a planned development, the tie in of requiring a water well is illogical and unnecessary and, thus, does not "substantially advance" a "*legitimate government interest.*"  That argument misses the mark.  There is no dispute among the parties that Ordinance 3549 was created in response to the request to rezone the land in PD-130 to include retail and multi-family units, as opposed to the initial zoning of only single-family residential.  The parties further do not dispute that the water supply would be necessary to support the intended development.  However, Babcorp argues that because there are more steps to take after initial zoning approval before building can occur, the requirement of the water well was unnecessary at the zoning stage.  The argument does not state that the ordinance is unreasonable or arbitrary; it only states that it could be seen as premature at that stage.  We disagree.  The City, when deciding whether to approve rezoning, recognized that if the land were used for the intended purpose once rezoned, it would create a public need for water, and thus, the City created Ordinance 3549.  As a result, the trial court did not error in determining that Ordinance 3549 was not arbitrary or unreasonable.  We overrule this sub-issue.

### 2. Unconstitutional Exaction

"A regulatory taking may occur when a government conditions the granting of a permit or some other type of government approval on an exaction from a landowner seeking that approval."  *Sefzik v. City of McKinney*, 198 S.W.3d 884, 891 (Tex. App.—Dallas 2006, no pet.) (citing *Dolan v. City of Tigard*, 512 U.S. 374, 377 (1994); *Town of Flower Mound v. Stafford Ests. Ltd. P'ship*, 135 S.W.3d 620, 625 (Tex. 2004)).  "In an exaction takings case, some action

9

is required—exacted—from the landowner as a condition to obtaining governmental approval."

*Id.* (citing *Town of Flower Mound*, 135 S.W.3d at 625).

As explained in *Sefzik*, the Texas Supreme Court has adopted a "rough proportionality" test to determine whether an exaction constitutes a taking:

> [C]onditioning government approval of a development of property on some exaction is a compensable taking unless the condition (1) bears an essential nexus to the substantial advancement of some legitimate government interest and (2) is roughly proportional to the projected impact of the proposed development.

*Id.* (alteration in original) (quoting *Town of Flower Mound*, 135 S.W.3d at 634 (citing *Dolan*, 512 U.S. at 391; *Nollan v. Ca. Coastal Comm'n*, 483 U.S. 825, 837 (1987))). "The government must make an 'individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.'" *Id.* (quoting *Town of Flower Mound*, 135 S.W.3d at 633 (citing *Dolan*, 512 U.S. at 391)). "Thus, the burden of proof is on the government to prove that the condition imposed meets the test." *Id.* (citing *Town of Flower Mound*, 135 S.W.3d at 644).

We have already determined that the water well clause in Ordinance 3549 is related in nature to a legitimate government interest. As a result, we turn our attention to determine if the water well clause is "roughly proportional to the projected impact of the proposed development." *Town of Flower Mound*, 135 S.W.3d at 634. The facts presented by the City to support the contention that the water well clause within Ordinance 3549 was "roughly proportional," *see id.*, included the lack of any water supply infrastructure in the proposed development; the rezoning would increase the "density of buildings" and occupants to the land; without such a well, there would be insufficient water to serve the subdivision; and approximately fifty percent of the

10

"water extracted from the well would supply property inside and outside" of the development. Babcorp responds that the City's own arguments support its position—namely that the water well clause was premature because it was unnecessary to drill solely to obtain multi-family zoning. Babcorp contends that the drilling of the well would not have become necessary until a proposed development on the site was approved.

Again, the argument of when the Ordinance should have been put into effect falls flat. Babcorp is not arguing that the water well clause was unnecessary or not proportional to the need for the proposed development; it is only arguing that it was not proportional to the zoning request. We do not agree that such a distinction needs to be made. The City presented evidence that a water source was necessary for the proposed development to be approved and, thus, including it in Ordinance 3549 was not an unconstitutional exaction. We overrule this sub-issue.

### 3. Improper Surrender of Future Legislative Power

Babcorp argues that *Super Wash I* supports its position that the reversionary clause contained in Ordinance 3549 is void ab initio because it is an "improper surrender of future legislative power." *See Super Wash I*, 131 S.W.3d at 259. However, the Fort Worth Court of Appeals in *Super Wash I* specifically distinguished the facts of the case before it from cases "where a special permit is authorized by an ordinance requiring the property owner to comply with the conditions of the ordinance within a specified time, for example, within one year of the enactment of the ordinance, or the property would revert back to its prior classification." *Id.* Here, we have just that, an ordinance requiring the developer to comply with the conditions within one year of the enactment of the ordinance or an automatic reversion will apply.

11

Consequently, we disagree with Babcorp's argument that the reversionary clause is void ab initio because it is "an improper surrender of future legislative power." We overrule this sub-issue.

### 4. Lack of Notice and Hearing

Babcorp argues that the reversionary clause is invalid because "reclassification" or "***rezoning***" can only occur "by a properly enacted zoning ordinance" requiring mandatory notice and hearing. We disagree.

As the City points out in its brief, the clause at issue here was part of Ordinance 3549. The City gave notice of and held several hearings prior to the December 6, 1983, passage of Ordinance 3549 and the reversionary clause contained therein. The meeting minutes reflect that Great Western was aware of the meetings and of the contents of Ordinance 3549. Moreover, "[i]t is reasonable to say that in so providing, the city commission prescribed that the ordinance was to become operative on the happening of a specific contingency within one year." *Sherwood Lanes, Inc. v. City of San Angelo*, 511 S.W.2d 597, 599 (Tex. App.—Austin 1974, writ ref'd n.r.e.) (citing *State Highway Dep't v. Gorham*, 162 S.W.2d 934 (1942); *Trimmier v. Carlton*, 296 S.W. 1070 (1927); *City of San Antonio v. Brady*, 315 S.W.2d 597 (1958) (per curiam)). A contingency in an ordinance that is to become effective upon a certain date is not invalid. *See Sherwood Lanes*, 511 S.W.2d at 599. Finding that there was notice and a hearing regarding Ordinance 3549 and the contingency within the ordinance, we overrule this sub-issue.

For these reasons, we overrule Babcorp's first issue, arguing that the water well clause was void ab initio.

12

## III. Estoppel

Babcorp's second issue argues that the City's conduct in the years following the enactment of Ordinance 3549 bars the City from enforcing the water well clause or shows that the water well clause was satisfied, thus leaving the multi-family zoning intact. Babcorp points out that, for "40+ years," the City acted in such a way to confirm that the PD-130 zoning remained in effect. Specifically, Babcorp argues that (1) the City should be estopped from enforcing the water well clause, (2) laches applies to maintain PD-130 zoning, (3) waiver applies to maintain PD-130 zoning, and (4) ratification applies to maintain PD-130 zoning.

### A. Standard of Review

The Texas Supreme Court recently analyzed the issue of equitable estoppel in *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597 (Tex. 2025). There, the Court stated:

> Whether equitable estoppel applies is a question for a court to decide. *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). Different parts of that question are governed by different standards of review.
>
> If there is a dispute of material fact regarding one or more of the five elements of equitable estoppel, that dispute must be resolved by the finder of fact. *See Huynh v. Blanchard*, 694 S.W.3d 648, 673, 675 (Tex. 2024); *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979). . . .
>
> In contrast, "[t]he [trial] court, not the [factfinder], determines whether" the case is an exceptional one requiring estoppel against a municipality. [*City of White Settlement v.*] *Super Wash*, 198 S.W.3d [770,] 774 [(Tex. 2006)]. Because this part of the question concerns the expediency, necessity, and propriety of equitable relief, *id.*, an appellate court reviews the trial court's decision for abuse of discretion. *See Huynh*, 694 S.W.3d at 673–74. A court abuses its discretion when it errs in determining what the law is or applying the law to the facts, or when it could reasonably have reached only one decision on the record yet fails to do so. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

*PDT Holdings*, 712 S.W.3d at 603–04 (first three alterations in original).

13

**B. The City is Estopped from Enforcing the Reversionary Clause Against Babcorp**

**1. Estoppel**

"[A] municipality may be estopped in those cases where justice requires its application, and there is no interference with the exercise of its governmental functions." *City of White Settlement v. Super Wash, Inc.* (*Super Wash II*), 198 S.W.3d at 774 (Tex. 2006) (quoting *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 836 (Tex. 1970) (citing *City of Dallas v. Rosenthal*, 239 S.W.2d 636 (Tex. App.—Dallas 1951, writ ref'd n.r.e.))).

**a. When "[J]ustice [R]equires"[2]**

In *Super Wash II*, the Court cautioned, "Although 'this exception is available only in exceptional cases where the circumstances clearly demand its application to prevent manifest injustice,' . . . we have applied the exception in cases where city officials led the plaintiff to believe that certain legal requirements had been met or waived." *PDT Holdings, Inc. v. City of Dallas*, 712 S.W.3d 597, 606 (Tex. 2025) (citation omitted) (quoting *Super Wash II*, 198 S.W.3d at 774 (citing *City of San Antonio v. Schautteet*, 706 S.W.2d 103, 105 (Tex. 1986) (per curiam); *Roberts v. Haltom City*, 543 S.W.2d 75, 78–79 (Tex. 1976))).

As part of the agreement to convert the land from single-family to multi-family, Babcorp's predecessor was required to provide certain benefits to the City. Babcorp argues that the City "has accepted and retained land and other benefits from Babcorp and its predecessors." Such benefits include, among others, the $650,000.00 payment for the water well, the 0.6094-acre water well site deeded to the City, which the City maintains ownership over, and the water

---

[2] *Super Wash II*, 198 S.W.3d at 774 (emphasis added).

well and use of the well for thirty-five years. For these reasons, Babcorp claims that the City, by accepting these benefits, led the parties to believe that requirements of the agreement had been satisfied.

After Babcorp filed its appellant's brief, the Texas Supreme Court issued its opinion in *PDT Holdings*, which further discussed the factors laid out in *Super Wash II*. *See id.* The Court in *PDT Holdings* stated,

> We observed in [*Super Wash II*] that our cases discussing when "justice requires estoppel" have involved "evidence that [(1)] city officials may have affirmatively misled the part[y] seeking to estop the city," and (2) the party "would [be] completely denied relief" absent estoppel because no "other remedies [are] available . . . that it has yet to pursue." We also noted the relevance of evidence regarding whether (3) "the misleading statements resulted in . . . permanent loss" or estoppel is "necessary for [the party's] continued operation," (4) the ordinance "was a matter of public record and discoverable by [the party] before it purchased the [property]," and (5) "the City acted quickly—within days of learning of its error—to notify [the party] of the [o]rdinance."

*PDT Holdings*, 712 S.W.3d at 606 (all alterations other than first in original) (footnote omitted) (citations omitted) (quoting *Super Wash II*, 198 S.W.3d at 775).

First, Babcorp argues, and we agree, that the City affirmatively misled the developer regarding the conditions related to the water well clause, specifically that it be completed by December 1984, rather than under construction by December 1984, which it undisputedly was. The meeting minutes affirmatively demonstrate that there was an understanding between City Attorney Hutchins and the developer that the contract for the City to develop the water well with reimbursement from the developer would satisfy the terms of Ordinance 3549's water well clause. The developer, who was concerned about the reversionary clause, spoke out regarding the water well clause's completion deadline of December 1984 and was reassured, on record, by

15

Hutchins that the language in the Ordinance specifically stated that the water well must be under construction by December 1984.

"[T]he intent of a misrepresentation is not material to this element: what matters in determining whether the City made a false representation is whether its representation was in fact untrue." *Id.* at 604. The developer, after being reassured of the language of the ordinance, entered into a contract with the City and reimbursed the City for the drilling of the water well. The water well was then drilled on the acreage deeded to the City, completed in March 1985, and used until 2020. Additionally, Babcorp presented evidence, which was stipulated by the City, that the City consistently maintained multi-family zoning in the 16.9-acre plot in PD-130, providing over twenty instances in which PD-130 confirmed the multi-family zoning over the last forty years. Specifically, as relevant to the case at hand, in 2002, when Babcorp purchased the parcel, the zoning for PD-130 maintained the multi-family designation. Later, in October 2021, the City directly confirmed that "[t]he proposed use of multifamily [was] permitted at this property." Taking this information collectively, there is more than a scintilla of evidence that shows the City's actions "affirmatively misled the [developer] into" believing it had complied with the Ordinance. *Id.* at 607.

Second, there is evidence that Babcorp would be denied relief absent estoppel. While Hess and Ricci argue that Great Western had a breach of contract claim against the City, such a claim would not afford Babcorp the relief it seeks. Hess and Ricci also cite in their brief to language in *Super Wash II* suggesting that other remedies might be available, such as seeking a variance or repeal of the Ordinance. Yet, when this dispute arose, the City immediately filed suit

against Babcorp to seek clarity on the issue, rather than standing by its zoning designation that had been in place for decades. Babcorp lost at the trial court level. Further, any future attempts at a variance will, in all likelihood, be met with a challenge by the Intervenors given their position in this case. Moreover, a request to rezone a piece of property adjacent to Babcorp's land from single-family to multi-family use failed in 2022 because a majority of landowners within 200 feet of the property protested the zoning change. As a result, we find that Babcorp has no alternative remedies that could have been pursued to provide adequate relief.

Third, there is evidence that Babcorp will suffer permanent loss. Brooks testified that he entered into a purchase and sale agreement with Chaparral Partners and that he believes Chaparral will terminate the agreement if the acreage is reclassified to single-family. Brooks also testified that Babcorp will suffer a significant negative financial impact if the property has single-family zoning and not multi-family zoning. Brooks further explained that he invested $73,000.00 for a paving lien assessment that he would not have paid if the property was zoned as single-family.

Fourth, Ordinance 3549 and the 1983 meeting minutes are part of the public record. However, as *PDT Holdings* explains:

> [A]lthough "parties have an obligation to discover and satisfy" applicable government regulations, that obligation "is in tension with" the government's obligation not to "publish[] an erroneous regulation" misdirecting a party "and then blam[e] the [party for] fail[ing] to discover the regulation was wrong all along." Where the party has "no independent knowledge" of a government requirement and is "not aware of any problem at all with simply following the [misleading] instructions given her by the [government]," the government may not hold her to that requirement. As explained above, that is what happened here.

17

*PDT Holdings*, 712 S.W.3d at 607–08 (citation omitted) (quoting *Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 263–64, 268 (Tex. 2019)).

The same is true in this case. When Charter purchased the property in 1992, Brooks conducted a prepurchase investigation in which he determined that the property was zoned as multi-family at that time. In 1997, Charter presented a development plan for multi-family use of the land to the City, and it was met with positivity by the City. The land remained designated as multi-family at the time Babcorp acquired it in 2002. The City reaffirmed several times after the acquisition that the land was still designated as multi-family. Although the ordinance and meeting minutes were part of the public record and discoverable by Babcorp before it acquired the property, there was no information available to suggest that the City would not comply with the multi-family zoning designation when the time came for development in the future. To the contrary, given the information available to Babcorp from the City regarding the multi-family designation prior to acquisition, Babcorp was reasonable in assuming any issues regarding the reversionary clause had been satisfied

Fifth, here, up until the plans were submitted for approval to the City for the multi-family development in 2022, there was nothing done by the City or otherwise to revert the multi-family designation to single-family. Babcorp relied upon the zoning information that designated the 16.9-acre portion of PD-130 as multi-family. It was only after Hess and Ricci filed their letter with the City seeking to stop any multi-family development that the City sought declaratory judgment from the trial court to determine the current status of the land.

18

The City argues that it cannot be estopped because it did not deliberately mislead the developer, nor was any benefit received sufficient to establish the rare exception of estoppel against the City. As we previously mentioned, the intent is immaterial—"what matters in determining whether the City made a false representation is whether its representation was in fact untrue." *Id.* at 604.

The City does not dispute that it did receive a benefit from the drilling of the well, but it argues that it was not the only one who received a benefit, including that Babcorp and the general public received a benefit as well. However, "evidence of a city receiving a benefit '*weighs in favor* of applying the exception.'" *Id.* at 608 (quoting *Super Wash II*, 198 S.W.3d at 775).

The trial court found that Babcorp failed to meet its burden to prove that it was entitled to equitable relief. However, based on the evidence in the record before us, we find that the trial court erred and that justice requires estoppel against the City. We now turn to whether estoppel will interfere with future performance of governmental functions.

### b. Future Performance of Governmental Functions

"'[T]he relevant inquiry is whether estopping the city in a single instance will bar the future performance of that governmental function or impede the city's ability to perform its other governmental functions' or 'affect public safety.'" *Id.* (alteration in original) (quoting *Super Wash II*, 198 S.W.3d at 776, 777). Here, the City argues that if it is estopped from enforcing the reversionary clause of Ordinance 3549, "the City would be wholly prevented from enforcing the validly enacted Ordinance 3549, which is directly tied to promoting public health, safety, moral,

19

and general welfare in ensuring adequate water supply." This is not the inquiry before us. *PDT Holdings*, in reiterating the holdings in *Super Wash II*, states that we are to determine whether estopping the City from enforcing the reversionary clause in Ordinance 3549 will prevent the future performance of governmental functions. *See id.* We find that it will not. The City is not being estopped from performing other governmental functions, only from reclassifying the 16.9-acre parcel of land zoned as multi-family in PD-130 back to single-family.

> Everyone agrees that the functions of municipal government implicated here are zoning and planning. The City contends that applying estoppel here would leave it unable to answer the concerns of neighbors regarding the Builder's over-height structure, impairing its ability to perform these governmental functions. But "precluding a city from performing a specific governmental function in a single instance is not *per se* interference with its governmental functions." Nothing in the record indicates that allowing this single over-height structure to remain would bar future enforcement of the [City] ordinance in other instances or hinder the City's ability to ensure public safety.

*Id.* at 608–09 (footnotes omitted) (citations omitted) (quoting *Super Wash II*, 198 S.W.3d at 776–77). Thus, we hold that estoppel will not interfere with a governmental function.

Accordingly, we sustain Babcorp's second issue as it relates to estoppel.[3]

---

[3]Having sustained Babcorp's issue related to estoppel, we need not address Babcorp's remaining issues on appeal. *See* TEX. R. APP. P. 47.1.

## IV.    Conclusion

We reverse the trial court's judgment and render judgment that Babcorp is entitled to relief on its equitable estoppel claim.

Scott E. Stevens
Chief Justice

Date Submitted:    August 11, 2025
Date Decided:      November 25, 2025